AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20)        ☐ Original   ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Central District of California

United States of America

v.

SUPPATRA "Susie" TANSUVIT,
ERIC "E" WILLIAM HANSON, and
JAMES BERTRAND TINSLEY,

Defendants

**LODGED**
CLERK, U.S. DISTRICT COURT

SEP - 3 2024

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ rsm _____ DEPTUY

Case No.  **2:24-mj-05348-DUTY**

**FILED**
CLERK, U.S. DISTRICT COURT

Sept. 3, 2024

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ tsn _____ DEPUTY

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

As described in the accompanying attachment, defendant violated the following statutes:

| Code Sections | Offense Description |
|---|---|
| 18 U.S.C. §§ 1349 and 1028A; 21 U.S.C. §§ 846 and 841(a)(1), (b)(1)(C) | Conspiracy to commit wire and bank fraud, aggravated identity theft, and conspiracy to distribute fentanyl |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

*/s Lyndon Versoza*
_____
*Complainant's signature*

Postal Inspector Lyndon Versoza
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:      September 3, 2024
_____        _____
                                        *Judge's signature*

City and state:   Los Angeles, California        Stephanie S. Christensen, U.S. Magistrate Judge
                                        *Printed name and title*

AUSA Andrew Brown, 11th Floor, x0102

**Complaint Attachment**

Count One, 18 U.S.C. § 1349

Beginning in or before 2023, and continuing through the present, in Los Angeles County, within the Central District of California, and elsewhere, defendants SUPPATRA "Susie" TANSUVIT, ERIC "E" WILLIAM HANSON, and JAMES BERTRAND TINSLEY, and others, conspired to commit wire and bank fraud, in violation of Title 18, United States Code, Sections 1343 and 1344. Defendants and their co-conspirators would steal the identities of victims, and manufacture counterfeit identity documents in the victims' names, but bearing photographs of themselves. Defendants would use the victims' identities and credit to obtain vehicles, rental properties, credit cards, and other goods and services. Defendants would also negotiate altered and counterfeit checks. Defendants and their co-conspirators used interstate wires to defraud their victims throughout this conspiracy. Federally-insured financial institutions defrauded by defendants include City National Bank, Bank of America, Citibank, Barclays, Capital One, Sutton Bank, and Truist Bank.

Count Two, 18 U.S.C. § 1028A

Beginning in or before 2023, and continuing through the present, in Los Angeles County, within the Central District of California, and elsewhere, defendants SUPPATRA "Susie" TANSUVIT, ERIC "E" WILLIAM HANSON, and JAMES BERTRAND TINSLEY knowingly transferred, possessed, and used, without lawful authority, a means of identification of another person during and in relation to a felony violation of Title 18, United States Code, Section 1349, Conspiracy to Commit Wire and Bank Fraud, as charged in Count One, knowing that the means of identification belonged to another actual person.

Count Three, 21 U.S.C. § 846

Beginning in or before 2023, and continuing through the present, in Los Angeles County, within the Central District of California, and elsewhere, defendants SUPPATRA "Susie" TANSUVIT, ERIC "E" WILLIAM HANSON, and JAMES BERTRAND TINSLEY conspired with others to knowingly and intentionally distribute a mixture and substance containing a detectable amount methamphetamine, a Schedule II controlled substance, and a mixture and substance containing a detectable amount of N-phenyl-N-[1-(2-phenylethyl)-4-piperidinyl ("fentanyl"), a Schedule II narcotic drug controlled substance, both in violation of Title 21, United States Code, Sections 841(a)(1), (b)(1)(C).

## AFFIDAVIT

I, Lyndon A. Versoza, being duly sworn, hereby depose and state as follows:

## I. TRAINING AND EXPERIENCE

1.    I am a United States Postal Inspector employed by the United States Postal Inspection Service ("USPIS"), Los Angeles Division, in Los Angeles, California, where I have served since June 2005.  I have been a federal law enforcement officer since 2002.  Currently, I am assigned to the USPIS Contraband Interdiction and Investigations Team in Los Angeles, California, where I am designated as a Money Laundering Specialist. In this capacity, I am responsible for investigating criminal violations of money laundering and structuring laws, such as when the services of the United States Postal Service are employed by criminals as part of the means to launder or conceal illicit funds, and/or avoid financial reporting requirements.  I am also one of seven Postal Inspectors in the U.S. currently designated by USPIS as a Subject Matter Expert ("SME") in money laundering investigations.  As a SME, I have spoken at money laundering conferences and provided training to my colleagues, the financial and banking industry and other law enforcement agents. I have also received both formal and informal money laundering training from USPIS and other government and private agencies. During the course of my career, my money laundering investigations have led to the successful seizure of assets

valued at hundreds of millions of dollars. During my approximately 19-year career as a Postal Inspector, I have investigated: thieves, burglars, rapists, mass-shooters, murderers, armed robbers, prison and street gangs, drug trafficking organizations, and perpetrators of financial violations (including money launderers, darknet vendors, digital currency launderers, identity thieves and fraudsters). For approximately five years, prior to investigating money laundering, I was assigned to investigate child exploitation and sex trafficking. In that assignment, I worked both independently and in a task force where I led and participated in investigations related to crimes involving the exploitation of children and sex trafficking domestically and internationally. In that capacity, I also earned a designation by USPIS as a SME in Child Exploitation Investigations.

2.    From 2002 to 2005, prior to my service as a US Postal Inspector, I served as a law enforcement officer with the US Immigration and Naturalization Service, which later became part of the US Department of Homeland Security. In this capacity I enforced immigration and customs law at an international airport and seaport, and later, worked in an intelligence unit for local and national counterterrorism and smuggling operations.

3.    I am familiar with the facts and circumstances described herein. This affidavit is based upon my personal involvement in this investigation, my training and experience, and information obtained from various law enforcement personnel

and witnesses, including information that has been reported to
me either directly or indirectly.  This affidavit does not
purport to set forth my complete knowledge or understanding of
the facts related to this investigation.  Unless specifically
indicated otherwise, all conversations and statements described
in this affidavit are related in substance and part only.  All
figures, times, and calculations set forth herein are
approximate.

## II. SUMMARY AND PURPOSE OF AFFIDAVIT: COMPLAINT AND SEARCH WARRANT

4.    This affidavit is made in support of a criminal
complaint against and arrest warrants for:

        a.    SUPPATRA "Susie" TANSUVIT ("TANSUVIT");

        b.    ERIC "E" WILLIAM HANSON ("HANSON"); and

        c.    JAMES BERTRAND TINSLEY ("TINSLEY")

for violations of 18 U.S.C. §§ 1349 and 1028A (conspiracy to
commit bank and wire fraud, and aggravated identity theft) and
21 U.S.C. §§ 846, 841(a)(1) (conspiracy to distribute controlled
substances).

5.    This affidavit is also made in support of an
application for a warrant to search the apartment used by
TANSUVIT, HANSON and TINSLEY for evidence of violations of 18
U.S.C. §§ 922, 1028A, 1341, 1343, 1344, 1349, 1956 (firearms
offenses, aggravated identity theft, conspiracy to commit mail,
wire, and bank fraud, and money laundering) and 21 U.S.C. §§
846, 841(a)(1) (conspiracy to distribute controlled substances)

(the "Subject Offenses"), as described more particularly in attachment B, which is incorporated by reference. The location to be searched, which is described more particularly in attachment A which is also incorporated by reference, is:

a.    639 N. BROADWAY, APT. 526 and ASSIGNED PARKING SPACES 79 AND 80, LOS ANGELES, CALIFORNIA 90012 (the "SUBJECT PREMISES").

A. Summary of Probable Cause

6.    TANSUVIT, HANSON, and TINSLEY are members of an identity theft and fentanyl trafficking crew that mostly operates out of Los Angeles. They rent properties in the names of victims of identity theft, which they use as both short-term residences and places to mix and sell fentanyl and to counterfeit identity documents. They frequently switch locations and stolen identities to stay ahead of law enforcement. So far in 2024, two of their clandestine labs have been searched by law enforcement, one in February and the other in June. They abandoned a third clandestine lab before law enforcement could search it.

The First Clandestine Lab Is Searched in February

7.    On February 21, 2024, LAPD executed a state search warrant at 770 S. Grand Avenue, Unit 7069, Los Angeles, an apartment which turned out to be a clandestine fentanyl laboratory and identity theft den ("First Clandestine Lab"). During this search LAPD encountered a clandestine laboratory and

seized about 7kg of fentanyl, as well as other drugs and a firearm.  Also recovered were dozens of counterfeit ID cards, including counterfeit cards bearing the stolen identities of victims and the faces of TANSUVIT and TINSLEY, social security cards, as well as digital key cloners (often used by car thieves to replicate car key fobs), as well as other car theft tools. TANSUVIT was arrested and released.

<u>The Second Clandestine Lab Is Searched in June</u>

8.    On June 5, 2024, the Los Angeles Fire Department responded to a structural fire at 2276 South Figueroa Avenue, Los Angeles, a commercial rental ("Second Clandestine Lab") that turned out to be another clandestine fentanyl laboratory. Police responded to the scene and obtained another state search warrant and recovered several guns, over 8 kilograms of fentanyl powder, and other illegal drugs.  Also recovered was a Digital Video Recorder System ("Clandestine Lab DVR"), which I later reviewed pursuant to separate federal search warrant. In the Clandestine Lab DVR, I observed video of a fentanyl lab operation and fraud den.  The video often showed  TANSUVIT and HANSON mixing and selling drugs, sometimes while armed.  They also traded guns with others. I also observed TANSUVIT and TINSLEY selling and trading identity documents, like IDs and credit cards, to unknown armed men.

<u>TANSUVIT and HANSON Sell Fentanyl from the Third</u>
<u>Clandestine Lab Before Abandoning It</u>

9.    In August 2024, an LAPD Confidential Source went to

8539 Lookout Mountain Ave, Los Angeles (the "Third Clandestine Lab") and covertly video-recorded buying fentanyl from TANSUVIT and HANSON there.

TANSUVIT and HANSON Reside at the SUBJECT PREMISES Now

10.    On August 16, 2024, I conducted surveillance at the apartment complex that contains the SUBJECT PREMISES.  I personally observed TANSUVIT and HANSON walk their two dogs across the street from the SUBJECT PREMISES.  I then watched them enter the apartment complex that contains the SUBJECT PREMISES.  I later learned from the apartment manager that TANSUVIT and HANSON rented APARTMENT NUMBER 526 (the SUBJECT PREMISES) under an assumed name, and using a telephone number associated with TINSLEY.  I saw parked in one of the assigned parking spaces for APARTMENT 526 a stolen vehicle and in the other a vehicle financed by identity theft.

B. Summary of Targets

11.    Some of the main operators the clandestine lab and fraud den operations are as follows:

       a.    SUPPATRA "Susie" TANSUVIT has multiple convictions for charges relating to identity theft. The longest sentence I saw in her record was 972 days in jail.  Her criminal history includes a conviction for failure to appear on a felony charge in 2020, and a revocation of her probation.  Law enforcement officers have told me that TANSUVIT's expertise is in identity theft, but my investigation indicates that although

she continues to commit fraud, she has expanded to also
operating clandestine fentanyl laboratories, and protects her
drug business with armed criminals.  Two of TANSUVIT's
Clandestine Labs in downtown Los Angeles have been searched by
law enforcement pursuant to search warrants, which have resulted
in the seizure of stolen identity profiles and credit cards,
over 15 kilograms of fentanyl, pounds of methamphetamine,
several firearms as well as equipment and chemicals used to
dilute pure forms of fentanyl.  From the search of TANSUVIT's
Second Clandestine Lab, in addition to drugs and guns, law
enforcement also seized a digital video recorder (the
Clandestine Lab DVR) which recorded surveillance video of the
criminals inside the lab.  From my review of the Clandestine Lab
DVR, I observed TANSUVIT mixing chemicals with drugs, using the
drugs, distributing stolen identity documents, and displaying
firearms.

        b.    ERIC HANSON is a boyfriend of TANSUVIT. From my
review of his criminal history, I know HANSON has a few
misdemeanor convictions in California for crimes related to
drugs and theft. He also has assault and shoplifting convictions
in New Jersey. There are also three warrants for his arrest out
of Pennsylvania, two for probation violations and one for a
parole violation. From my review of the Clandestine Lab DVR, I
observed HANSON participate in the manufacturing of fentanyl.
HANSON protects their drug business with guns along with other
armed co-conspirators during drug deals.  HANSON uses bulk cash

- 7 -

to buy and sell drugs.  HANSON appears to have joined TANSUVIT's conspiracy for the operation of TANSUVIT's Second Clandestine Lab, but appears to have conspired with other criminals before joining the same crew as TINSELY and TANSUVIT.  HANSON lives with TANSUVIT in properties she rents under her stolen identities.

       c.   JAMES TINSLEY ("TINSLEY") is a felon with a criminal history dating back to 2011 when he was convicted for possessing and selling controlled substances.  Since then, his arrests and convictions have been related to identity theft, forgeries, false IDs and credit card fraud.  His latest felony conviction was in October of 2023 for violations of California Penal Code 530.5 (identity theft), which resulted in a probation violation in January 2024. On August 30, 2024, I confirmed with Los Angeles County Probation that TINSLEY is on felony probation with search and seizure conditions which require that TINSLEY "submit his person and property under [his] control to search and seizure at any time of the day or night by any law enforcement officers with or without a warrant or probable cause."  From my review of the Clandestine Lab DVR, I observed TINSLEY at the Second Clandestine Lab almost daily while it was in operation.  I believe that TINSLEY's primary role is in identity and financial crimes, and as a runner for the drug and identity theft operations. He supports the operation of the clandestine labs by building furniture, setting up ventilation (during the manufacturing of fentanyl) and moving boxes.

TINSLEY appears also to be a financial element for the
operation. I have observed video of TINSLEY holding business
checks, check books, and stacks of identification cards. I also
reviewed bank records showing TINSLEY was laundering money
during the time the clandestine fentanyl labs have been in
operation.

III. **PROBABLE CAUSE STATEMENT**

   C. The February Search of an Apartment Rented by TANSUVIT Under a
      Stolen Identity Revealed a Fentanyl Laboratory and Evidence of
      Fraud (the First Clandestine Lab)

     12. I learned about an LAPD/DEA investigation of TANSUVIT.
In or around May 2024, I spoke with LAPD, Central Division, Gang
and Narcotics Officer Michael Mann. From speaking with LAPD
Officers and reading their reports, I learned that in November
2023, LAPD arrested Christian Laird (one of TANSUVIT's previous
boyfriends), whom officers observed discarding a clear plastic
bag, which later turned out to contain about 76 gross grams of
fentanyl. Laird attempted to flee from the police but was
detained. Inside Laird's vehicle, police found a semi-automatic
firearm in a satchel. On Laird's person, police found about 2.6
gross grams of methamphetamine.

     13. LAPD told me they used informant(s) to buy drugs from
TANSUVIT at the apartment residence where Laird and TANSUVIT
then resided (First Clandestine Lab). LAPD obtained a state
search warrant to search the First Clandestine Lab, which they
executed on February 23, 2024. LAPD Officers told me the First

- 9 -

Clandestine Lab was rented by TANSUVIT under a stolen identity. LAPD officers told me they previously spoke with the building management who reported to LAPD that they found a stack of fake IDs in the stairwell next to the TANSUVIT/Laird apartment unit. These IDs were fictitious and bore the photos of Laird. When shown the photo of TANSUVIT, building management recognized TANSUVIT, but said they know her as the tenant "Stephanie Cheng," and both she and Laird resided at the First Clandestine Lab (as described below, law enforcement later seized fake Driver Licenses in the name of Stephanie Cheng bearing the face of TANSUVIT). TANSUVIT, her then boyfriend Laird, and two other persons (Michael Miranda and Scott Sangmin Lee) were found in the apartment during the search. From this search, officers seized an industrial metal press (used to press powder such as fentanyl into bricks), a Punisher mold (used to press the fentanyl with the Punisher brand logo), about 7,000 gross grams of fentanyl, 820 gross grams of methamphetamine, 400 gross grams of heroin as well as other drugs like MDMA, psilocybin and pills. Along with the drugs, agents and officers found products to package, mold and seal fentanyl, large quantities of cutting agents, baggies, and a blender with fentanyl residue. Additionally, a square kilo sized block of fentanyl was drying in a dehydrator as the search warrant was being served.

14.  Also found during the search were a firearm, counterfeit ID cards, including counterfeit cards bearing the stolen identities of victims and the faces of TANSUVIT and

TINSLEY, credit cards and social security cards in other persons' names, digital key cloners (often used by car thieves to replicate car key fobs), as well as other car theft tools.

15.    In my training and experience, car thieves often steal also the identifying information left in the car, such as that of the registered owner.  Further, car thieves often engage in wire, bank, and mail fraud—all of which are specified unlawful activities for money laundering--when selling a stolen vehicle as they cannot truthfully acknowledge that it has been stolen.

16.    Scott Sangmin Lee and Miranda told LAPD they were just visiting the residence and did not live there.  Miranda was arrested for possession of a stolen firearm and was transported to LAPD Central Station.  He has been released on bond. Scott Sangmin Lee was arrested for two outstanding warrants.  Lee remains in custody.

17.    Laird was arrested for possession of narcotics while armed.  He remains in custody.

18.    TANSUVIT was arrested and then released by LAPD.  She invoked her Miranda rights.

D. <u>Chief Magistrate Stevenson Issues Search Warrant for Digital Evidence Seized During the February 2024 Search of the First Clandestine Lab</u>

19.    On May 21, 2024, the Honorable Chief U.S. Magistrate Judge Karen Stevenson authorized a warrant to search the electronic devices seized by LAPD on February 21, 2024, from the First Clandestine Lab, based on an earlier version of this

affidavit.

E. The First Clandestine Lab Contained Over 100 Stolen Identities

20.  On May 23, 2024, I met with LAPD Officer Mann, who gave me evidence seized from TANSUVIT's residence (the First Clandestine Lab) on February 21, 2024.  From reviewing this evidence, I observed about 105 items containing different Personal Identifying information, including stolen mail, US Passport Cards, Passports, US Employment Authorization Cards, US Permanent Resident Cards, Credit Cards, Debit Cards, Checks, Treasury Checks, Bank Statements, Social Security Cards, Vehicle certificate of titles, ID cards and driver licenses.

21.  On August 24, 2024, I reviewed these documents, which among other things included:

     a.  A fake US Passport Card in the name of Sherwin Maglanoc, bearing the face of TANSUVIT;

     b.  A fake Illinois Driver License in the name of Kathleen Abell, bearing the face of TANSUVIT;

     c.  A fake California Driver License in the name of Aditya Manthramurthy, bearing the face of TANSUVIT;

     d.  A fake California Driver License in the name of Stephanie Cheng, bearing the face of TANSUVIT;

     e.  A fake Texas Driver License in the name of Stephanie Cheng, bearing the face of TANSUVIT;

     f.  A fake Illinois Driver License in the name of Anna Karen Mendez, bearing the face of TANSUVIT;

g.    A fake California Driver License in the name of Gabrielle Gargoles, bearing the face of TANSUVIT;

h.    A fake California Driver License in the name of Andrew Grimes, bearing the face of TINSLEY;

i.    A $122,175 business check made to Solidarity Consulting Inc. in Van Nuys, paid from CVR Associates in Alpharetta GA from Truist Bank in North Carolina;

j.    A Bank of America bank statement in the name of Harvey and Mae Wyman Family Trust;

k.    A Barclays Platinum MasterCard in the name of Regina R. Eise;

l.    A Capital One MasterCard in the name of Ahra L. Cho;

m.    Citibank mail correspondence to Ahra Cho indicating that Ahra Cho applied for but was not approved for a MasterCard;

n.    Citibank mail correspondence for Ahra Cho containing the Personal Identification Number for Ahra Cho's debit card;

o.    A Fidelity Investments Visa Debit Card in the name of Daniel Andelic;

p.    A full CLEAR profile containing identifying information for victim Orlando Moreno.  CLEAR is a tradename used by the Thomas Reuters company for a service that searches multiple databases.  This report includes his name, social security number, date of birth, driver license number, email

addresses, phone numbers, aliases, and history of all associated
addresses;

> q.   Social Security Card for David Alexander Clarke;

> r.   Sutton Bank Visa Debit Card in the name of Sokly
Dan; and also

> s.   A blank US Treasury Check.

F. The Second Clandestine Lab Caught on Fire and Prompted Emergency
   Response on June 5, 2024

22.   From reading their affidavit and speaking with
investigators, I learned that on June 5, 2024, members of the
Los Angeles Interagency Metropolitan Police Apprehension Crime
Task Force ("LA IMPACT") Group 12, which specializes in
clandestine laboratories, responded to a request from the Los
Angeles Fire Department to investigate a possible clandestine
drug laboratory at the Second Clandestine Lab, which was
discovered while extinguishing a structure fire at the location:

> a.   LAPD said that LAFD responded to a structure fire
at the Second Clandestine Lab.  Upon arrival, they observed a
couch on fire inside the patio area that had activated the
building fire sprinkler system. After extinguishing the fire,
fire personnel entered the location to check for any additional
fire and remove the water that had entered the building while
extinguishing the flames and saw what they believed to be
narcotics and narcotics manufacturing equipment inside. Fire
personnel determined there was no immediate danger from
additional fires and contacted LA IMPACT. Fire personnel

- 14 -

observed gross contamination of white powder substance on
various surfaces inside the location and used testing equipment
to test the substance which resulted in a positive result of
Methamphetamine, Fentanyl, and Mannitol (a sugar alcohol often
used as a cutting agent for controlled substances).

b.    LA IMPACT entered the location to perform a
public safety assessment after donning nitryl gloves, N95 mask,
and chemical resistant boots and observed several items
consistent with an active narcotic "cutting" and packaging
operation including several blenders, suspected fentanyl, powder
cocaine in brick form, new glass pipes commonly used to smoke
rock cocaine, a large container of Mannitol, mixing spoons,
scales, and gross contamination of white powder on tables and
walls. A handgun was in an open cabinet door in the kitchen
area. After going upstairs to the second story of the business,
a plastic bag as well as an open purse was observed containing a
large amount of unknown currency.

c.    LA IMPACT investigators obtained a state search
warrant to search the Second Clandestine Lab.  Detectives told
me that they found in the Second Clandestine Lab, among other
items, the Clandestine Lab Electronic Devices (the Clandestine
Lab DVR), chemicals, cutting agents, a brick press, embossing
logo, dozens of unopened bottles of Xanax, large quantities of
fentanyl, methamphetamine, two semiautomatic assault rifles,
four handguns and about $18,645 in cash.  Both of the
semiautomatic assault rifles were AR-style (the civilian version

- 15 -

of the M-16 assault rifle formerly used by the U.S. Army), with
a shoulder stock, pistol grip, and used detachable magazines.
Loaded high-capacity magazines with were found by them.  One of
the assault rifles was outfitted with a laser dot site, and was
manufactured in Hebron, Kentucky, by Anderson Manufacturing.
AR-style assault rifles fire powerful ammunition that can shoot
through the standard bullet resistant vests worn by police
officers, which are designed to stop less powerful pistol
rounds.  There were no persons present when officers arrived.
LA IMPACT weighed the drugs seized from the Second Clandestine
Lab to be about 16 pounds of fentanyl and other drugs.

## G. Janitor Recognized TANSUVIT as Occupying the Second Clandestine Lab

23.  On June 6, 2024, LAPD Officer Mann told me he spoke
with the owner of the building, Janice Dominguez.  Ms. Dominguez
provided law enforcement with a copy of the lease agreement,
which I have also reviewed.  Ms. Dominguez said the property was
leased by "Barbara Ponik."  Ms. Dominguez told Detective Mann
that she never met Barbara Ponik, and only spoke with her on a
video call (as she claimed to live in Florida), to sign the
lease.  Ms. Dominguez was shown a photo of TANSUVIT.  Ms.
Domiguez did not recognize her, however, the janitor of the
premises who also saw the photo of TANSUVIT recognized TANSUVIT
as one of the people occupying the Second Clandestine Lab.

24.  Based on my training and experience and the history of
this case as described above, I believe the name "Barbara

- 16 -

Ponik," which was used to sign the lease for the Second
Clandestine Lab, is a stolen identity. Given TANSUVIT's criminal
history of identity theft, LAPD previously finding numerous fake
IDs bearing her face in victim names, and that TANSUVIT had
rented a prior apartment under a stolen identity, and the place
rented was an illegal clandestine drug laboratory, I believe
Barbara Ponik is likely to be a victim of identity theft.

H. Warrant Issued for Second Clandestine Lab Electronic Devices

25.  LAPD Detective John Hong turned over the Clandestine
Lab Electronic Devices, all of which were seized from the Second
Clandestine Lab during the execution of the June LAPD search
warrant, to me.  I booked the Clandestine Lab Electronic Devices
as evidence in this case. Detective Hong sent the drugs to the
Los Angeles Sheriff Department laboratory for further analysis.
The sheriffs reported that the drug seizures from the Second
Clandestine Lab were identified as follows: 8.7 gross kilograms
of fentanyl powder, 225 gross grams of methamphetamine, and
other drugs like cocaine, heroin and psilocybin mushrooms.

26.  On June 11, 2024, the Honorable U.S. Magistrate Judge
Joel Richlin issued a warrant to search the Clandestine Lab
Electronic Devices found in the Second Clandestine Lab, which
also included the Clandestine Lab DVR, based on an earlier
version of this affidavit.

I. Clandestine Lab DVR contained evidence of violations of the Subject Offenses

27. On June 21, 2024, I reviewed the Clandestine Lab DVR. In my review I observed that the Second Clandestine Lab was equipped with three cameras. These three cameras captured not just the outside of the Second Clandestine Lab, but also the interior of the dwelling, much of which included footage of TANSUVIT, HANSON, and TINSLEY committing violations of the Subject Offenses. For example:

a. I reviewed video from the Clandestine Lab DVR, which was timestamped May 25, 2024, at 12:14 PM. In this particular video, I observed a man I recognized from his DMV photos as HANSON. LAPD Detective Mann told me he learned from a different informant that HANSON is the current boyfriend of TANSUVIT. In this video I observed HANSON hand a drug package to an unidentified man.

b. I reviewed video from the Clandestine Lab DVR, which was timestamped May 25, 2024, at 03:39 PM. I observed TINSLEY walk into the Second Clandestine Lab carrying a large carboard box. A woman wearing a white track suit ("Track Suit Woman") followed behind TINSLEY and later opened the box and took out what appeared to be an ID printing machine. TINSLEY and Track Suit Woman leave after they placed the ID printing machine on a shelf.

c. A few minutes later I observed TANSUVIT hand what appeared to be credit and ID cards to unidentified males who

- 18 -

were already in the room sitting on the couch. These men then pulled out their guns. I observed two men sitting on a couch playing with guns. One of the men on the couch handed a black pistol to a bearded man who then passes the gun to TANSUVIT.

d.    At 3:41, TINSLEY and Track Suit Woman walk back into the Second Clandestine Lab. Track Suit Woman pulled out what appear to be a stack of plastic cards (from some viewing angles the cards appear to be ID cards) from a satchel and hands it to TINSLEY, who thumbs through the cards.

e.    About 10 minutes later at 3:58 PM, a man walks in holding a brown paper bag. I observed another man hand him stacks of loose cash, as well as cash in plastic bags. The man puts the cash in the paper bag. While the man is placing the cash into the bag, TINSLEY walks into the door carrying a small duffle bag, which he hands to HANSON. HANSON and TINSLEY walk out of view.

f.    I reviewed video from the Clandestine Lab DVR, which was timestamped May 25, 2024, at 04:36 PM, I observed TINSLEY sitting on a couch inside beside two handguns, one on either side of him. In the video, TINSLEY grabbed a pouch, which he opened and removed the contents. As he thumbed through the contents of the pouch, I observed these items to be indicative of mail theft or identity theft. For example, at 4:37:51, he examines what appeared to be a stack of cashier or business checks.

g.    I reviewed video from the Clandestine Lab DVR,

- 19 -

which was timestamped May 26, 2024, at 06:08 PM.  In this video, I observed TANSUVIT walk around, while another man is seen loading a gun.  This same male is captured on other occasions loading bullets into magazines, and then into guns with others.

    h.    I reviewed video from the Clandestine Lab DVR, which was timestamped May 26, 2024, at 10:16 PM.  In this video, I observed another unidentified male load several guns and show them off.

    i.    I reviewed video from the Clandestine Lab DVR, which was timestamped May 29, 2024, at 01:32 AM.  In this video, I observed HANSON and an unidentified man with braids in his hair ("Braided Man").  Braided Man is seen counting a stack of cash.  HANSON then took out chunks of what appeared  to be fentanyl from a dehydrator (which is a device often used in the manufacturing of street fentanyl). HANSON then put the chunks of drugs on the counter.  Braided Man then placed the drugs in a plastic bag. Another angle of this sequence showed Braided Man leave carrying a satchel around his torso. HANSON grabbed the stack of cash and walked off screen.

    j.    I reviewed video from the Clandestine Lab DVR, which was timestamped May 29, 2024, at 9:54 AM.  In this video, I observed TANSUVIT wearing latex gloves and a respirator mask. She then mixed powders that resemble fentanyl and cutting agents in metal mixing bowls and blenders.  Also in this video is HANSON, who assists her.  TINSLEY walks in carrying ventilation ducts and other equipment, which they later install (to vent out

the harmful chemicals of the laboratory).  I also observed
TINSLEY smoke a glass pipe containing what I believe to be
fentanyl.  TANSUVIT and the other suspects in this video are
captured on multiple occasions manufacturing drugs that resemble
fentanyl.

       k.  Also on May 29, 2024 at approximately 12:11 AM, I
observed TINSLEY walk into the video frame holding a pistol with
his right hand.  He reached into the kitchen cabinets and
grabbed a brown canvas grocery bag and walked out of frame. On
the counter near him was a kilo sized bag of what looks like
fentanyl powder.  Later during LA IMPACT's search of the Second
Clandestine Lab, law enforcement found a gun resembling the gun
TINSLEY was seen holding in the video, and it was in the same
kitchen cabinet where the video showed him grabbing the brown
canvas grocery bag. This recovered handgun was a 9mm
semiautomatic Springfield Hellcat pistol. It was recovered with
12 live rounds in its magazine. Springfield Hellcats are made in
Croatia.

       l.  I reviewed video from the Clandestine Lab DVR,
which was timestamped June 3, 2024, starting about 11:00 AM.  In
this video, I observed TANSUVIT and HANSON receive several
bricks of drugs from an unidentified man.  The unidentified man
cut into each of the bricks and then HANSON sampled the drugs by
smoking them.  Then TANSUVIT and HANSON mixed the drugs with
cutting agents, mixing bowls and multiple blenders. Seen on the
counter in front of HANSON during the drug deal is a handgun,

which at one point HANSON moved out of the way, to make room for
the manufacturing of the drugs.

        m.   I observed in the DVR, on June 5, 2024, before
6:00 PM, people in the video ran around chaotically, then the
video appeared smokey before the fire sprinklers turned on and
the fire department and police responded.

J. <u>TANSUVIT and HANSON Sell Fentanyl from the Third Clandestine
Lab, Before Abandoning that Airbnb</u>

        n.   I reviewed undercover video of an LAPD
Confidential Informant ("CI1") purchasing fentanyl from TANSUVIT
and HANSON in August, 2024, inside the Third Clandestine Lab,
which is an Airbnb.  In the video, I saw HANSON and TANSUVIT
show CI1 samples of fentanyl before selling the drug to CI1.  I
watched as HANSON and CI1 negotiated for the price of the drugs.
During this meeting TANSUVIT told CI1 she had her "fraud stuff"
at her new apartment.  (As described in this affidavit, her
newest apartment is the SUBJECT PREMISES).  Also during this
meeting, HANSON, TANSUVIT and CI1 discussed manufacturing
fentanyl.  I took possession of the powdered substance.  I sent
the substance to USPIS laboratory for analysis, which showed
that it contained well over 400 grams of a mixture containing
fentanyl.

    28.  In late August, I reviewed an Airbnb listing that
appeared to match the Third Clandestine Lab.  It showed that
that property was vacant and available to rent.  Police
surveillance conducted on August 25, 2024, also showed no

activity there beyond lights on inside the unit.  This made it appear as someone was occupying the place.  Outside the residence the trash bins had been left out for pickup. On August 27, 2024, I observed this unit had been listed on Airbnb as currently available for rent. Thus it appears that HANSON, TANSUVIT, and their crew abandoned the Third Clandestine Lab before law enforcement could search it.

K. Financial Records Show TINSLEY is involved in various Frauds

29.  On August 20, 2024, I reviewed records from City National Bank which stated that between February and March 2023, TINSLEY was involved in a check fraud scheme in which checks were stolen from a victim, altered and made payable to TINSLEY and two other co-conspirators.  The bank lost $13,132.76 in the scheme. Bank of America's records show the same conduct and indicated the funds from the altered checks were depleted by TINSLEY using ATM cash withdrawals.

30.  I also reviewed records from Bancorp Bank, which reported TINSLEY's suspicious movement of funds between May and August 2024.  This time frame coincides with the operation of the Second Clandestine Lab as well as the later drug operations. According to these records, TINSLEY conducted 120 suspicious transactions totaling $45,240.61 during that time frame. TINSLEY sent and received peer-to-peer payments using CASH APP, Visa Money Transfers, and Card-to-card transfers.  The bank considered, "[t]he overall activity is considered excessive for

the time frame in which the transactions were conducted. There were several instances where debits were made in quick succession once credits were received, indicating rapid movement of funds. The activity is suspicious due to a large portion of sourcing funds are unknown and the large amount of funds being transferred, where legitimate purpose of activity cannot be established. Noted is the fact that no verifiable source of funds (payroll/tax refund) was observed, which is unusual for this card product."

L. HANSON Attempted to Open a Cryptocurrency Account Using a Stolen ID Card

31.  I reviewed records from Coinbase, a company that provides cryptocurrency accounts and services, which showed that in September 2023, HANSON unsuccessfully attempted to establish a cryptocurrency account using the California driver's license of victim Aaron Mauricio Martinez.  When trying to establish the account, HANSON submitted a photograph of the victim's driver's license.  As part of its verification process, Coinbase then used the camera of HANSON's digital device to photograph him, so that it could compare the image on the driver's license with its photographs of HANSON.  Because the images did not match, Coinbase repeatedly reject HANSON's efforts.  In one of HANSON's selfies, he appears to try to get around Coinbase's photo-matching security feature by brushing his hair forward to obscure as much of his forehead as possible and tying a bulky cloth around his neck, which hides his neck and obscures his

jawline.  From reviewing HANSON's DMV and booking photographs, I
can see that the Coinbase selfies are of HANSON, who does not
look like the photograph of Aaron Mauricio Martinez, whose CDL
HANSON attempted to pass off as his own.  In my training and
experience, Coinbase is an international company that operates
in interstate and foreign commerce.  My internet research
indicates that their U.S. servers are located in New Jersey,
Illinois, and Virginia, so HANSON's misuse of the Martinez
driver's license would have crossed state lines.  AUSA Andrew
Brown told me that the Ninth Circuit has held that the internet
itself is an instrumentality of interstate commerce.  U.S. v.
Costanzo, 956 F.3d 1088, 1092 (9th Cir. 2020) ("We have long
recognized that the Internet and the nation's vast network of
telephone lines are instrumentalities of and intimately related
to interstate commerce.")

M. In August, 2024, TANSUVIT and HANSON Moved to the SUBJECT
   PREMISES

    32.  On August 16, 2024, an FBI Special Agent and I
conducted surveillance at the SUBJECT PREMISES.  At
approximately 6:15 PM, I observed TANSUVIT and HANSON, whom I
recognized from both their booking photographs and the DVR
recordings of them at the Second Clandestine Lab, patronizing
some shops and walking their dogs across the street from the
SUBJECT PREMISES.  At about 6:27 PM, I watched HANSON and
TANSUVIT enter the SUBJECT PREMISES building from the entrance
at the southwest corner of the building.  On August 20, 2024, I

spoke with the Manager for the SUBJECT PREMISES building who
provided me with records and videos.  From these records I
observed that at 6:28:53, the key fob for APARTMENT 526 (the
SUBJECT PREMISES) was used to access the elevator from the
parking garage near where I saw them.  Surveillance video
provided by the Manager also showed TANSUVIT and HANSON with
their two dogs and utilizing a unique PIN assigned to their unit
to call an elevator.

33.  I also reviewed the lease records for the SUBJECT
PREMISES and learned that the identity used to rent it (Sarah
Lee) is of a person who physical resembles TANSUVIT, but is not
her. In my training and experience, identity thieves prefer to
impersonate victims who resemble them when they will be
physically observed by persons they wish to deceive, such as
when renting an apartment in which they will reside under that
stolen identity. The apartment documents listed a phone number
ending in -9732 as the home phone number for Sarah Lee.  In my
research I found the -9732 number was associated with a person
that lives at TINSLEY's parents' residence.  Specifically, the -
9732 number is tied to banking reports of fraud committed by a
person who uses TINSLEY's parents' address.

34.  On August 22, 2024, Postal Inspector Noah Thompson and
I spoke with the Manager for the SUBJECT PREMISES. From speaking
with the Manager, I learned that the SUBJECT PREMISES had two
ASSIGNED PARKING SPACES 79 and 80.  Inspector Thompson and I
went to PARKING SPACES 79 and 80 and saw two vehicles parked

there.  The first was a 2024 Subaru Outback registered to a "Sen
Liang" at the same apartment building as the First Clandestine
Lab, but a different apartment number.  I reviewed loan
documents from J.P. Morgan Chase, which according to the
vehicle's registration was the lienholder.  It included a
photocopy of the buyer's California driver's license.  The
identifying information on that CDL matched that of the true Sen
Liang, but the photographs on the CDL presented to J.P. Morgan
Chase did not match the true DMV photograph for Sen Liang.
Accordingly, it appears that the loan was obtained by a co-
conspirator using a good quality counterfeit CDL who merely
resembled the true Sen Liang.

    35.  The second vehicle parked in the ASSIGNED PARKING
SPACES for the SUBJECT PREMISES was a 2024 Audi Quattro Q3 (the
"Stolen Audi").  I went to look at the Vehicle Identification
Number of the Stolen Audi and observed it had a hole broken into
the windshield where the VIN would normally be.  The broken
windshield hole where VINs are normally located was covered by a
small piece of rubber.  I moved the rubber resting on the broken
windshield and observed that a paper sticker was pasted over
where a VIN should have been.  The paper bore a number that
looked like a VIN.  I took a photo of the VIN and the license
plate.  I later learned from analysts that the license plate I
saw on the Stolen Audi Q3 was actually registered to a 2024 Audi
A4, and had been switched.  I also learned that the VIN number
on the paper belonged to a different car that had been shipped

and sold outside the United States.  In my training and experience, auto thieves often attempt to obscure VINs and swap license plates on the cars they steal to make it harder to track their thefts. (As previously described, the LAPD recovered auto theft tools from the First Clandestine Lab.)

36.    In my training and experience, all the financial institutions mentioned in this affidavit are federally insured.

## IV. TRAINING AND EXPERIENCE REGARDING IDENTITY THEFT AND DRUG TRAFFICKING

37.    From my training and experience, and from discussions with other investigators with dozens of years of experience investigating counterfeit identity documents, identity theft, and drug trafficking, I know the following:

a.    Makers of counterfeit identity documents must maintain specialized equipment and supplies to craft convincing counterfeits of drivers licenses and other identity documents, such as card printers, cameras, raised printers, laminators, die cutters, etching equipment, scoring and cutting tools, ultra-violet printers, holographic printers, magnetic stripe and/or chip encoding devices, ink and cartridges for the required printers, pvc cards, Teslin sheets, holographic self-adhesive sheets, laminating sheets and pouches, specialized glues and adhesives, and various computers and software required to design identifications as well as operate much of the above described equipment.  Much of this equipment can also be used to create counterfeit checks, credit cards, and other financial

- 28 -

instruments, so many identity document counterfeiters are also involved in fraud generally. Typically, criminals store such equipment and supplies where they feel it is safe and readily accessible to them, most commonly at their residence.

b.    Counterfeit identity documents are often used to commit identity theft. That is, criminals purchase counterfeit identity documents so that they can impersonate particular individuals, for example to withdraw money from a bank, to negotiate a counterfeit check, or use a stolen or counterfeit credit card. In more sophisticated operations, false identity documents have been used to obtain mortgages when the criminal tricks a lender or notary into believing that the criminal is the real homeowner.

c.    Individuals involved in identity theft and fraud schemes must keep evidence of their schemes, such as victim information and accounts used in the scheme, simply to keep the scheme going. Much of this evidence is now stored on digital devices such as computers and smartphones.

d.    Counterfeiters of identity documents have to possess the identifying information that is to be written on the documents they will produce, such as names, drivers' license numbers, social security numbers, addresses, ID-sized photographs, signatures, and so forth. Typically, this information is transmitted and stored digitally.

e.    Professional identity document counterfeiters are often paid in cash, as all those involved seek anonymity. More

- 29 -

recently, some use cryptocurrency or peer-to-peer payment
systems like Venmo or Zelle to receive their payments.
Regardless of the payment method, professional counterfeiters
must keep track of which customers have paid them in order to
stay in business.  Commonly this is done digitally.  Many
professional counterfeiters will deposit some of their cash
proceeds into bank accounts, or use them to purchase money
orders or cryptocurrency, so that they can spend the proceeds at
places that do not commonly accept cash payments, such as for
rent, or store the proceeds safely.

        f.    Generally, perpetrators of fraud and
counterfeiting schemes maintain the evidence described above
where it is close at hand and safe, such as in their residences,
automobiles, and, especially with smartphones, on their person.
For larger or more sophisticated frauds, participants often
attempt to distance themselves from some of the incriminating
evidence by renting public storage units or safety deposit boxes
where they often keep the items they will not need immediate
access to.

        g.    Members of a criminal conspiracy must communicate
with one another out of necessity.  Commonly this is done by
text, email, telephone, or specialty communication application,
often an encrypted one such as WhatsApp, and most often by
smartphone.  Members of the conspiracy commonly carry their
smartphones, which include the contact information for their co-

conspirators, on or near their persons, such as in their cars or residences.

h.    Individuals involved in drug trafficking, money laundering, and structuring schemes usually keep evidence of their schemes, such as pay-owe sheets, contact information for their co-conspirators, suppliers and customers, and records documenting the movement of criminal proceeds on their digital devices, which they usually keep on their persons, in their vehicles, and in their residences.

i.    Drug traffickers often maintain on hand large amounts of United States currency or cryptocurrency in order to maintain and finance their ongoing drug trafficking businesses. Such currency is often stored in their residences and vehicles.

j.    Communications between people buying and selling drugs usually take place by telephone calls and messages, such as email, text messages, and encrypted messaging applications, sent to and from cell phones and other digital devices. This includes sending photos or videos of the drugs between the seller and the buyer, the negotiation of price, and discussion of whether or not participants will bring weapons to a deal.

k.    Drug traffickers often keep drugs in places where they have ready access and control, such as at their residence. They also often keep other items related to their drug trafficking activities at their residence, such as digital scales, packaging materials, pill presses, cutting agents,

blenders, and proceeds of drug trafficking, and the digital devices they employ to conduct their drug trafficking.

l.    It is common for drug traffickers to own multiple phones of varying sophistication and cost as a method to diversify communications between various customers and suppliers. These phones range from sophisticated smart phones using digital communications applications such as Blackberry Messenger, WhatsApp, and the like, to cheap, simple, and often prepaid flip phones, known colloquially as "drop phones," for actual voice communications.

## II.    TRAINING AND EXPERIENCE ON DIGITAL DEVICES

38.   Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.    Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.    Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.    The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d.    Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

- 33 -

39.   Based on my training, experience, and information from
those involved in the forensic examination of digital devices, I
know that it is not always possible to search devices for data
during a search of the premises for a number of reasons,
including the following:

a.   Digital data are particularly vulnerable to
inadvertent or intentional modification or destruction.  Thus,
often a controlled environment with specially trained personnel
may be necessary to maintain the integrity of and to conduct a
complete and accurate analysis of data on digital devices, which
may take substantial time, particularly as to the categories of
electronic evidence referenced above.  Also, there are now so
many types of digital devices and programs that it is difficult
to bring to a search site all of the specialized manuals,
equipment, and personnel that may be required.

b.   Digital devices capable of storing multiple
gigabytes are now commonplace.  As an example of the amount of
data this equates to, one gigabyte can store close to 19,000
average file size (300kb) Word documents, or 614 photos with an
average size of 1.5MB.

40.   The search warrant requests authorization to use the
biometric unlock features of a device, based on the following,
which I know from my training, experience, and review of
publicly available materials:

a.   Users may enable a biometric unlock function on
some digital devices.  To use this function, a user generally

displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b.    In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

c.    In my training and experience, the person who is in possession of a device or has the device among his or her belongings at the time the device is found is likely a user of the device.  However, in my training and experience, that person may not be the only user of the device whose physical characteristics are among those that will unlock the device via biometric features, and it is also possible that the person in whose possession the device is found is not actually a user of that device at all.  Furthermore, in my training and experience,

- 35 -

I know that in some cases it may not be possible to know with
certainty who is the user of a given device, such as if the
device is found in a common area of a premises without any
identifying information on the exterior of the device.  Thus, if
while executing the warrant, law enforcement personnel encounter
a digital device within the scope of the warrant that may be
unlocked using one of the aforementioned biometric features, the
warrant I am applying for would permit law enforcement personnel
to, with respect to every person who is located at the SUBJECT
PREMISES during the execution of the search who is reasonably
believed by law enforcement to be a user of a biometric sensor-
enabled device that falls within the scope of the warrant:
(1) depress the person's thumb- and/or fingers on the device(s);
and (2) hold the device(s) in front of the face of the person
with his or her eyes open to activate the facial-, iris-, and/or
retina-recognition feature.

        41.  Other than what has been described herein, to my
knowledge, the United States has not attempted to obtain this
data by other means.

**V.** **CONCLUSION**

        42.  For the above reasons, there is probable cause to
believe that SUPPATRA "Susie" TANSUVIT, ERIC "E" WILLIAM HANSON,
and JAMES BERTRAND TINSLEY violated 18 U.S.C. §§ 1349 and 1028A
(conspiracy to commit bank and wire fraud, and aggravated
identity theft) and 21 U.S.C. §§ 846, 841(a)(1) (conspiracy to

distribute controlled substances), and that evidence,

contraband, fruits, or instrumentalities of the Subject Offenses

will be found at the SUBJECT PREMISES.

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this 3rd day of
September, 2024.

_____
 HON. STEPHANIE S. CHRISTENSEN
UNITED STATES MAGISTRATE JUDGE